Good morning, Your Honor. Carolyn Phillips appearing on behalf of the petitioner-appellant Lorenzo Fosselman. This matter, the issue that was certified was whether or not there is a regulation that actually prohibited the behavior for which Mr. Fosselman was disciplined while he was an inmate at Pleasant Valley State Prison. Well, Counsel, Section 3005B requires inmates to promptly and courteously obey written and verbal orders and instructions. And your client was given an instruction to be interviewed. So why isn't that a sufficient regulation? Your Honor, I believe that the Fifth Amendment comes into play here. There is an acknowledgment by the Department of Corrections that an inmate is not required to interview or even to file a behavior chrono. That is not a basis for discipline. So what we have is a general obey order, but then we also have the Fifth Amendment that would allow an inmate to remain silent when interviewed. But he didn't even show up. He didn't invoke a Fifth Amendment right someplace. Well, I believe that his understanding, if I may extrapolate, his understanding is that he had no information. His knowledge was that he didn't have a requirement. That doesn't relieve him of an obligation to cooperate. Well, I don't think that the Fifth Amendment would come. In some ways, he's anticipating the questions that will be asked him and decided  Well, I believe what he's relying on, Your Honor, is that the Fifth Amendment doesn't require him to answer those questions. But, counsel, that's like saying that someone doesn't have to obey a subpoena to come to court if, when they get there, they either have nothing particular to add to the case or they intend to invoke their Fifth Amendment privilege. It doesn't relieve them of the obligation to show up. And why isn't this similar? I think what the other factor that comes into play here is that the basis for having Mr. Fossman come in and interview, the foundation for that actually was in a regulation that is a confidential regulation. It's a regulation where the procedures are not known or shared with the public or with the individual. But the obligation to come in and talk is not, that's not secret. That's not an unusual protocol. That may be correct, Your Honor. But what we have is, I think, conflict between two understood criteria that were in place at the time in this prison. One, an inmate doesn't have to interview, doesn't have to sign any documents. And, two, he's supposed to obey these orders, but when it comes into a conflict with the Fifth Amendment, I think that's the issue. And that's where the Monterey Superior Court, who had the last reason decision to do that, I think has the best case.     And I think that's where the issue is. Roberts. Counsel. Counsel, you're here under 2254, which means that we don't get to correct the errors of the California courts as though we thought it were on direct appeal. So we're supposed to have clearly established Supreme Court authority. So what's the best case? Well, the best case, I believe, are the cases that I've cited in my brief. In terms of the due process requirements, before you can have the requirement for a notice for it to show up and be disciplined, you have to know what the regulations are that you're being disciplined for. Okay. But 3005 is pretty clear, isn't it? So what's the problem? I think 3005 is a very general regulation. As I indicated earlier, the Fifth Amendment is very specific in its terms of its protections for inmates, even inmates in the prison system. And so by reading the Fifth Amendment, the California courts should have known that they were making a mistake? I think what the California courts should have done was to determine whether or not there was, in fact, a regulation that required Mr. Fossman to interview and sign a chrono, a behavioral chrono. And the Monterey court did not do that. Okay. I can reserve time for rebuttal if there's any other questions. Thank you. Good morning. May it please the Court, Deputy Attorney General Stephen Warner for Appellee. The State Court reasonably applied Hill in this case to find that the disciplinary report satisfied the minimally stringent sum evidence test. There's at least a modicum of evidence that Mr. Fossman disobeyed more than one order to be interviewed after a period of unrest in the prison. His failure to obey these orders to be interviewed violated Section 3005B of the Title 15. The interview which Mr. Fossman refused to participate in was necessary for prison officials to gather information, determine which inmates posed a threat to other inmates and staff members, and safely return the prison to a normal program. What would be the point of the interview if either the individual had no useful information or intended to invoke the Fifth Amendment privilege? The best way that I can answer that question is to say that, first of all, there's no clearly established Federal law applying the Fifth Amendment to this situation, a prison disciplinary context. And second of all, I would say that the what's important, another point that's important here is the deference that prison administrators have in running prisons and in determining what sorts of situations require information gathering. Could Mr. Fossman have invoked a Fifth Amendment privilege against self-incrimination? Well, I mean, certainly he could have said so. I don't – I can't speak to what the hearing officer would have said at the hearing if he had said that, nor what the State court would have done with that. It seems to me that even if he had invoked – it's just hard to say. I mean, certainly he could have invoked it, but I don't know what would have – how that would have changed the outcome. You're not aware of any authority that a prisoner can have. Correct. Yes. Yeah. Fifth Amendment. And generally, of course, prisoners live in an environment that's heavily restricted and their conduct, their behavior, their activities are very regulated. I take it the factual context of this is that there was a lot of gang activity and there was a kind of a modified lockdown situation. Yes, that's correct. And in that situation, it's incumbent that the authorities have the ability to conduct the program and sort of, you know, interview the inmates as they need to. And certainly as someone who is in prison in a restricted environment, Mr. Fosselman was aware that interviews happen and that this regulation is something that could lead to discipline in various contexts. Now, to the extent that the opening and reply briefs in this case imply that there is – that the due process clause requires some sort of level of notice as to the fact that a disciplinary report may be received for a particular conduct, again, I would say that there isn't any clearly established federal law stating that. What we're left with is Hill, which is the Supreme Court's other than Wolf and those procedural protections are not challenged here. Hill is the evidentiary standard, and that's a minimal standard. And it just can't be said here that the State Court's application of Hill is so contrary to find that the application does satisfy Hill. So unless the Court has any questions, I will conclude by saying that under the deference in AEDPA as well as the deference inherent in the sum evidence test, this Court should uphold the district court's decision and as well as the State court's decisions. Thank you. Thank you, counsel. Ms. Phillips, you have time remaining if you'd like to have rebuttal. Your Honor, in terms of the context of this particular disciplinary action, Mr. Hind was part of the inmate population that had already been cleared to go back into general population. The request to come in and interview was made after the decision to return the African American population back to the general population of the prison. Mr. Flosselman understood, as had been recognized by the prison staff and CDCR itself, that there was no regulation that was going to require him to come in and interview and sign any crimes before he could be released. How would you draft such a regulation? What kind of regulation would there have had to be in your view? I'm sorry, I can't hear you. How would you draft that regulation? What would it say? Well, there is no regulation that requires that. No, no. What kind of regulation are you looking for? What level of specificity in your view does there have to be in regulation? Well, there's not going to be – there's no regulation that's going to be able to say you have to come in, you have to interview, you have to sign a Crono. That's already been established because of the Fifth Amendment protections. So what you have is a counter regulation which requires participation in, but you don't have to interview and you don't have to sign a Crono. So it's sort of – maybe I'm not being clear. Well, you were saying that they can't draft a regulation. Well, they have an event that you have to comply with. Well, that's true. There is no regulation that is currently drafted. What the practice is, and this is what I think is where Mr. Fasselman became entangled, what the practice is, is after there is a lockdown and there is an unlocked protocol, which is this – was what spurred the interview request, was that they want the inmates to come in and sit down. They don't have to say anything. They don't have to sign anything. So if Mr. Fasselman had gone into the interview room, he wouldn't have been disciplined if he hadn't said anything or if he hadn't signed anything. So as the regulations exist, it poses sort of a quandary, I think, for the inmate. If you know that you don't have to say anything, it's sort of we have Mr. Fasselman asserting that right now. Right. But he could have promptly and courteously – he could have promptly and courteously, which is what the requirement says, obey written and verbal orders and instructions. He could have come in and said courteously and promptly, I don't know anything about – I don't know anything about the incident in question here. Well, I think he could have done that, but I think what we have is the protections that he was living under in terms of the Fifth Amendment that he was asserting by his saying, I'm not going to interview, I'm not going to sign anything. So you have these two regulations that are somewhat contradictory in nature. And where does it fall out? Where we have – what we have, then, is Mr. Fasselman being put in a situation where he's disciplined and he loses good time credits. And I don't believe that the regulations as they exist gave him sufficient notice that he could have avoided that. I mean, having a general regulation that says you have to obey everything, it doesn't require you to give up all your constitutional rights. That's not what the regulation stands for. And it certainly doesn't seem to go with the CDCR practices, even in this situation. Thank you. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments of both of you today.
judges: Schroeder, Graber, Bybee